42 A.3d 951

**FIZZANO BROTHERS CONCRETE PRODUCTS, INC.**

**v.**

**XLN, INC., Successor in Interest to System Development Group, Inc.**

**v.**

**Shore Consultants, Ltd., Gregg A. Montgomery, David Binder, and XLNT Software Solutions, Inc.**

**Appeal of Fizzano Brothers Concrete Products, Inc.**

Supreme Court of Pennsylvania.

Argued Nov. 30, 2010.

Decided March 26, 2012.

244

Robert Daniel Ardizzi, Paul A. Bucco, Davis Bucco & Ardizzi, Conshohocken, for Fizzano Brothers Concrete Products, Inc.

John Hartman May, May, Metzger, and Zimmerman, L.L.P., Lancaster, for XLNT Software Solutions, Inc.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

At issue in this appeal is a question of corporate successor liability under the *de facto* merger doctrine or exception. The trial court concluded that XLNT Software Solutions, Inc. ("XLNT") was liable for a judgment owed by XLN, Inc. ("XLN"), pursuant to this exception. XLNT and XLN lacked common shareholders and higher management; however, the

corporations each employed the same two key employees in positions of authority and who, at all relevant times, were principal owners of the essential asset around which the business of the two corporations operated.

The Superior Court determined that the trial court misapplied the de *facto* merger exception and, hence, reversed. We granted allowance of appeal to determine the following issues:

1. Does the *de facto* merger doctrine always require proof of continuity of ownership?
2. Did the Superior Court improperly substitute its own fact-finding for that of the trial court?

*Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.,* 606 Pa. 48, 994 A.2d 1081 (2010) (*per curiam* ).

## I. BACKGROUND

Appellant, Fizzano Brothers Concrete Products, Inc., purchased a license for accounting and manufacturing software, known as the XLN Enterprise Management Software ("the Software"), from System Development Group, Inc. ("SDG") sometime prior to 2000. Appellant paid $66,818.25 for the license, Software implementation, training, and sales tax, based on assurances or expectations that the Software would update and streamline Appellant's ability to track sales, maintain accounts receivable, and improve record keeping. However, Appellant was never able to implement the Software.

On April 19, 2000, XLN acquired all of the stock and assets of SDG, in addition to all of its liabilities, pursuant to a **stock** purchase agreement. Appellant filed a cause of action against XLN on October 25, 2001, alleging breach of contract and breach of express warranty arising from the failure of the Software's implementation. XLN denied Appellant's essential allegations.

On or about September 4, 2004, after securing leave of court, Appellant filed an amended complaint, joining XLNT and its president, Gregg Alan Montgomery ("Montgomery"), as additional defendants. Appellant joined these defendants after learning that on or about August 29, 2003, XLNT had

entered into an **asset** purchase agreement with XLN, pursuant to which XLNT purchased virtually all of XLN's assets. Included in the agreement was the transfer of control over the Software, which was owned by the former shareholders of SDG, subject to payment of two promissory notes. Appellant alleged that the additional defendants had engaged in a fraudulent transfer of assets, and further alleged that XLNT was liable under the original breach of contract and warranty actions as the successor corporation of XLN. Following the trial court's denial of their preliminary objections, XLNT and Montgomery filed an answer denying the critical allegations in the amended complaint.

Although there was no dispute that XLN had assumed all of the liabilities of SDG under the stock purchase agreement, including those liabilities arising from the licensing of the Software to Appellant, XLNT contended that, as mere purchaser of the assets of XLN, it had no responsibility arising from Appellant's lawsuit, as XLNT had not expressly assumed XLN's potential liability concerning Appellant. This contention is supported by a general principle of corporation law that a purchaser of a corporation's assets does not, for such reason alone, assume the debts of the selling corporation, unlike a purchaser of the corporation's stock. *See Continental Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1291 (2005) (*"Schneider II"*). However, exceptions to this principle include circumstances where (1) the asset sale amounted to a consolidation or a *de facto* merger;[1] or (2) the purchasing corporation was merely a continuation of the selling corporation. *Id.*[2] Appellant argued that XLNT was liable under these

---

1. A statutory, or *de jure,* merger results in the successor corporation assuming the liabilities of the predecessor corporation(s). 15 Pa.C.S. § 1929(b).

2. More specifically, this Court has recognized the following five exceptions to the general rule:

 (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or [a *de facto* ] merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consider-

two exceptions. Because Appellant's contentions are factually based, a more thorough review of the essential transactional background must be undertaken.

At the time of the sale of SDG to XLN, ownership of the Software was transferred from SDG to SDG's shareholders, Daniel T. Fritsch, Jr., Michael R. Hamlin, Phillip C. Theis, and Paul J. Stehlik ("the Shareholders"). XLN purchased SDG's stock for $5,420,000, with the majority of the purchase price being paid to the Shareholders in the form of two promissory notes totaling $5,100,000. The stock purchase agreement provided that the source code for the Software would be placed in escrow, and that the ownership of the Software would remain with the Shareholders until the promissory notes were paid in full. Under both promissory notes, Shareholders Fritsch and Hamlin were each to receive 42.223% of the value of the note.[3]

The right to license the Software was the primary asset of value acquired by XLN. Two of the developers, who were also the primary owners of the Software, Shareholders Fritsch and Hamlin, were given employment contracts by XLN and worked at the company on a daily basis. However, neither Fritsch nor Hamlin was a shareholder of XLN, nor were the other two Shareholders.[4] XLN operated out of the same Lancaster, Pennsylvania location where SDG had conducted its business. On January 17, 2003, XLN terminated Fritsch and Hamlin from their employment as part of an effort to stop cash outlays while XLN attempted to sell the company. Notes of Testimony ("N.T."), 10/24/06, at 82.

ation and no provisions were made for creditors of the selling corporation.

*Continental Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1291 (2005) (*"Schneider II"*).

**3.** Shareholder Theis was to receive 5%, and Shareholder Stehlik was to receive 10.554%, of payments made under the notes.

**4.** The shareholders of XLN were all investment companies. The Board members were Robert Binder, Richard Baxendale, Scott Baxendale, Tony Kernan, and Chuck Austin. Notes of Testimony ("N.T."), 10/24/06, at 86.

On August 5, 2003, XLNT was incorporated in New York. The sole shareholders of XLNT are Montgomery and Richard Alexander. Montgomery, who owns 75% of XLNT's stock, is also that corporation's president. In the month of its incorporation, XLNT entered into the asset purchase agreement with XLN, pursuant to which XLNT purchased virtually all of XLN's assets, including intellectual property, accounts receivable, customer lists, good will, licenses, trademarks, trade names, and copyrights; XLN retained only two workstations and servers and an undeveloped derivative of the Software. XLN also assigned its lease of the premises in Lancaster to XLNT, which thus further obtained all leasehold improvements from XLN. The two aforesaid workstations and servers retained by XLN were to remain at this business location. Under the agreement, XLN also retained two customers, but was required to change its corporate and business name.[5]

As with XLN's stock purchase from SDG, the "key asset" acquired by XLNT was the right to license the Software. Trial Court Opinion, dated 4/11/07, Finding of Fact No. 27. The trial court credited testimony that (1) the right to license the Software was the only asset of XLN of significant value; (2) a software company "lives and dies" by its software; (3) XLNT's purchase of XLN's assets without the inclusion of the right to license the Software would have been meaningless; and (4) without the right to license the Software, XLN would have had difficulty remaining in business. *Id.*, Findings of Fact Nos. 29–31. Indeed, the asset purchase agreement was expressly contingent upon XLNT coming to a contemporaneous agreement with the Shareholders whereby the Shareholders would ultimately transfer their ownership of the Software to XLNT, again contingent upon the satisfaction of promissory notes held by the Shareholders.[6]

5. In accordance with this requirement, XLN changed its name to XE, Inc.

6. Under the agreement, XLNT also purchased a half-interest in a derivative of the Software known as "TreX" or "T–Rex," with XLN retaining the remaining share. However, it was established at trial that T–Rex was nothing more than "a screen laid out," with "no functionali-

The asset purchase agreement was also contingent upon the execution and delivery, simultaneous with the closing, of employment contracts between XLNT and Fritsch and Hamlin. These individuals had independently negotiated with XLNT, with XLN's consent, the value of the source codes for the Software, and the terms of conditions of their employment with XLNT. They were to perform the same duties for XLNT as they had for XLN. XLNT also hired from XLN its sole remaining employee.

A schedule to the asset purchase agreement listed five existing claims against XLN, both those in litigation, including Appellant's cause of action, and those not yet in litigation. XLNT agreed to assume liability only for one claim not in litigation. Further, the agreement required XLN to refrain from competing with XLNT by engaging in any activity involving the Software or any similar product. Following the sale, XLNT's website, which Hamlin helped to create, identified XLNT as the successor company to XLN. *Id.*, Finding of Fact No. 43.

## II. *TRIAL COURT PROCEEDINGS*

Appellant filed a motion for summary judgment against XLN, which did not file a response. Indeed, on September 23, 2005, XLN's counsel was granted leave to withdraw from the case. Because of the non-response, the trial court granted Appellant's summary judgment motion against XLN in the amount of $114,105.

The case against XLNT and Montgomery then proceeded to a three-day bench trial. Following the trial's conclusion, the court entered a verdict for Appellant and against XLNT for $114,000, consistent with the court's extensive findings of fact and conclusions of law. More specifically, the trial court concluded that XLNT was liable to Appellant under the "*de facto* merger" and "mere continuation" exceptions to the gen-

ty," and that none of XLN's thirty existing customers used it. Trial Court Opinion, Findings of Fact Nos. 32–33.

eral rule of corporate non-liability following a purchase of assets, pursuant to the following rationale.

With respect to the *de facto* merger exception, the court noted that four factors are generally examined to determine the existence of this exception:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.*, Conclusion of Law No. 5 (quoting *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir.1985)).

The trial court determined that, with respect to the asset transfer between XLN and XLNT, all of the above elements had been met, save for the second one regarding continuity of shareholders. With respect to the first factor, the court observed that there was a continuity of management because "key personnel from SDG and XLN," namely Fritsch and Hamlin, were also key personnel at XLNT: Hamlin, as Chief Operating Officer, controlled XLNT's day-to-day operations, and Fritsch, as Chief Technology Officer, controlled XLNT's technology issues. *Id.*, Conclusion of Law No. 11. The court further noted that XLNT hired XLN's sole remaining employee, thus evidencing a continuation of employees.

The court then noted an undisputed continuation of physical location, passed from SDG to XLN to XLNT. Further, XLNT

acquired all of the assets of XLN, except for two customers, two computer servers with workstations, and XLN's stock. With respect to the primary asset involved, the court observed that the Software continued to be owned by the Shareholders under both XLN and XLNT until the purchase price was fully paid. *See id.*, Findings of Fact Nos. 39–40. Finally, the general business operations of XLN and XLNT were the same, involving the same essential personnel, key asset, customers (except for the two retained by XLN), and office location.

With respect to the third factor, the court observed that because of the asset purchase agreement, XLN "essentially ceased operating." *Id.*, Conclusion of Law No. 17. Although XLN had changed its name and retained two customers, it had ultimately become "dormant," in the words of its CEO and one of its shareholders, David Binder, and, as determined by the trial court, "can be considered out of business." *Id.*

Concerning the last factor, the court concluded that "XLNT clearly assumed all of the obligations of XLN that were ordinarily necessary for the uninterrupted continuation of normal business operations." *Id.*, Conclusion of Law No. 18. These obligations included the lease of the work premises, payment of salary to the same key employees, servicing the same clients, assuming a debt owed to one of the clients, and taking "responsibility for XLN's accounts receivable." *Id.*, Conclusion of Law No. 19. Further, the court noted that the most significant obligation of XLN that was assumed by XLNT was the debt owed for the Software, which asset was vital to the operation of XLNT's business. *Id.*, Conclusion of Law No. 20.

For the above reasons, the court determined that "it is clear that there was a *de facto* merger [arising from] the asset purchase agreement between XLN and XLNT." *Id.*, Conclusion of Law No. 21. In arriving at this determination, the court explicitly rejected XLNT's argument that **all four** *de facto* merger factors or prongs must be present in order to find corporate successor liability under this doctrine, noting

that no Pennsylvania appellate decision has ever required such.

The trial court went on to determine that XLNT was also liable under the "mere continuation exception" to the general rule of no corporate successor liability where there is a transfer of assets. The court noted that many of the considerations concerning this exception are identical to those of the *de facto* merger doctrine, which the court had already determined to be substantially present. However, citing *U.S. v. Keystone Sanitation Co., Inc.*, 43 ERC 1404, 1996 WL 672891 (M.D.Pa. 1996), the court observed that the mere continuation exception places significance on the new company holding itself out to be the continuation of the predecessor company. Here, the evidence showed that XLNT specifically held itself out to be the "successor" to SDG; hence, the trial court determined, XLNT was therefore necessarily the successor to XLN. Trial Court Opinion, Conclusions of Law Nos. 22–26.

Finally, the court rejected Appellant's claims that either XLNT or Montgomery was responsible under a fraudulent transfer of assets because Appellant failed to carry its burden of proof on these claims. However, because the court determined that the evidence supported the existence of both the *de facto* merger and the mere continuation exceptions to the general rule of no corporate successor liability where there is a transfer of assets, the court entered judgment for Appellants and against XLNT.

## III. *SUPERIOR COURT DECISION*

The Superior Court reversed the judgment against XLNT, determining that (1) the record did not support the trial court's findings that three of the four factors for the *de facto* merger exception had been met; and (2) the purportedly absent fourth factor—continuity of ownership between XLN and XLNT—was **indispensable** for establishing the *de facto* merger exception.[7] Regarding this latter determination, the court held:

7. By footnote, the Superior Court also noted that the trial court had "made reference" to the mere continuation exception. *Fizzano Bros.*

With regard to continuity of ownership, the trial court acknowledged that none of the owners of XLN became owners of XLNT. This finding, by itself, should have ended the trial court's consideration of XLNT's potential successor liability. Continuity of ownership is a key element that **must exist** in order to apply the *de facto* merger doctrine, since in the absence of a transfer of stock for assets the consequence of the transaction is not the functional equivalent of a merger. Instead, where there is no continuity of ownership[,] the transaction is merely an arms-length transaction between two corporations and not in any sense a merging of two corporations into one. As one federal court of appeals put it, without "continuity of shareholder interest, the two corporations are strangers, both before and after the sale."

*Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 973 A.2d 1016, 1020 (Pa.Super.2009) (quoting *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir.1977); emphasis added; citation to Trial Court Opinion omitted).

The Superior Court then rejected Appellant's argument that the Superior Court had previously ruled that continuity of ownership is **not** an essential element of the *de facto* merger exception in *Continental Ins. Co. v. Schneider*, 810 A.2d 127, 135 (Pa.Super.2002) (*"Schneider I"*), aff'd, 582 Pa. 591, 873 A.2d 1286 (2005). The court said that, although *Schneider I* did indeed state that not all four factors need be present for the exception to exist, *Schneider I* ultimately held that the trial court had improperly granted summary judgment in favor of the successor corporation, concluding that no *de facto* merger had occurred, because genuine issues of material fact regarding the continuity of ownership factor remained. The Superior Court here characterized that holding as **emphasiz-**

*Concrete Products, Inc. v. XLN, Inc.*, 973 A.2d 1016, 1019 n. 2 (Pa.Super.2009). (In fact, the trial court had concluded that Appellant had proven this exception and it was used in support of the court's verdict.). The Superior Court stated that the mere continuation exception "could not possibly apply" in this case because of a lack of commonality between the officers, directors, and shareholders of XLNT and those of XLN, which had continued its existence. *Id.*

**ing** the importance of the continuity of ownership in establishing the *de facto* merger exception.

With respect to its determination that the record did not support the trial court's conclusions regarding the other three *de facto* merger factors, the Superior Court first turned to the factor pertaining to the cessation of the seller's business after the transaction. The court concluded that the trial court's determination that this factor weighed in favor of finding a *de facto* merger was unsupported by the record. Although the trial court found that XLN had become "dormant," the Superior Court determined that the record shows that at the time of the asset sale, neither XLN nor XLNT had intended that XLN would cease operations. The court noted that XLN had initially remained in business after the sale, and had retained two customers and the computer equipment and software source code needed to service those customers.

Regarding the factor pertaining to the assumption of liabilities ordinarily necessary to continue the business, the Superior Court opined that neither party had sufficiently developed the record on this issue. The Superior Court then rejected the trial court's reliance on the fact that XLNT had spent time and money to resolve issues with one of XLN's former customers. The Superior Court observed that XLNT had explicitly assumed **that** responsibility in the asset purchase agreement, but explicitly disclaimed XLN's other liabilities.

Finally, the Superior Court concluded that the record did not support the trial court's findings regarding the factor pertaining to the continuity of management, personnel, physical location, assets, and general business operations. More specifically, the Superior Court determined that the record did not support the finding that management had continued from one entity to the other. The court opined that the record did not contain the names of XLN's board of directors at the time of the sale, and, other than the name of the CEO, the record was silent regarding XLN's officers at the time of the sale. For this reason, the court determined that it was impossible to conclude that management had continued from XLN to XLNT. The Superior Court disagreed with the trial court that

there was a continuation of management because XLNT had hired XLN's former employees, Fritsch and Hamlin. Because XLN had terminated the two men's services several months before the asset purchase and the evidence showed that neither individual had power to make legal or personnel decisions on XLNT's behalf, the Superior Court concluded that XLNT's hiring of the two did not show a continuation of management. Noting that XLNT **did** purchase XLN's accounts receivable, customer lists, intellectual property, name, and physical location, the court determined that these continuations of XLN's business were "hardly surprising" considering the sale of XLN's assets. *Fizzano Bros., supra* at 1023. The court concluded: "As such, by itself [continuity of general business operations] does not weigh strongly in favor of the imposition of successor liability. It is clearly outweighed in this case by the lack of continuity of ownership or management and by the continued corporate existence of XLN after the transaction." *Id.*[8]

Throughout its opinion, the Superior Court focused narrowly on the transactional relationship between XLN and XLNT. It did not focus, as did the trial court, on the longer transactional relationship that linked SDG, the Shareholders, XLN, and XLNT.

## IV. *DE FACTO MERGER/CONTINUITY OF OWNERSHIP*

■ The first question this Court must address is whether the Superior Court correctly held that continuity of ownership is an essential element required to support the imposition of corporate successor liability under a theory of *de facto* merger. As this question is purely one of law, our standard of review is *de novo,* and our scope of review is plenary. *Kistler v. State Ethics Commission,* 22 A.3d 223, 227 (Pa.2011).

---

**8.** Judge John Bender filed a brief dissenting opinion. He concluded that the majority had (1) misread *Schneider I* as holding that continuity of ownership was required for the *de facto* merger exception; and (2) substituted its own factual findings for those of the trial court.

Appellant argues that, until this case, the Superior Court has never held that a single factor—continuity of ownership or otherwise—was a requirement for establishing *de facto* merger; rather, previous Superior Court case law had provided that courts should simply "consider" each of the four relevant factors to determine whether a *de facto* merger had occurred. *See Schneider I*, 810 A.2d at 135 (citing *Commonwealth v. Lavelle*, 382 Pa.Super. 356, 555 A.2d 218, 227 (1989) (*en banc* )) ("Although each of [the four *de facto* merger] factors is considered, all need not exist before a *de facto* merger will be deemed to have occurred."). Appellant asserts that it was erroneous for the Superior Court to conclude in the present case that the above language is tempered by, and must fall to, the *Schneider I* court's purported "emphasis" that continuity of ownership is the critical factor to be considered in a *de facto* merger analysis. Appellant points out that the *Schneider I* court merely reversed the trial court's grant of summary judgment in favor of the successor corporation because the record established that there was an outstanding issue of material fact on the continuity of ownership factor. Appellant thus contends that the *Schneider I* court's rather routine holding does not transmute the continuity of ownership factor into an indispensable "key" element of the *de facto* merger exception.

Appellant also argues that the Superior Court's holding in this case is internally contradictory, in that the Superior Court emphasized "that courts should not 'elevate form over substance' in determining whether a successor should be liable." *Fizzano Bros., supra* at 1020 (citing *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106, 108 (1981)). Appellant contends that the Superior Court's current position that continuity of ownership between XLN and XLNT is the key, indispensable factor in the relevant analysis in this case effectively **does** "elevate form over substance."

Appellant further notes that the Superior Court in this case, also in contradictory fashion, recognized that the *de facto* merger exception was "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those

assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership, but wears a 'new hat.' " *Id.* at 1019–20 (quoting 15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7124.10 (perm.ed., rev.vol.2004)). Appellant observes that, as evidenced by this case, it is clear that by requiring evidence of a formal continuity of ownership, businesses can avoid being subject to the *de facto* merger exception simply by crafting transactions that omit common shareholders. Appellant argues that, again as evidenced by the present case, the Superior Court's opinion thereby opens up the very abuse the *de facto* merger exception was designed to prevent.

Appellee, XLNT, argues that the Superior Court's conclusion that continuity of ownership "and/or control" is "key" for determining corporate successor liability, where there has been an asset rather than stock purchase, is consistent with the holdings of several federal district and circuit court opinions, including the United States Court of Appeals for the Third Circuit. XLNT's Brief at 11–12 (citing, *e.g., Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455 (3d Cir. 2006) (applying Pennsylvania law); *Tracey v. Winchester Repeating Arms Co.*, 745 F.Supp. 1099 (E.D.Pa.1990) (applying Pennsylvania law); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265 (D.N.J.1994) (applying New Jersey law); *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41 (2d Cir.2003) (applying New York law); and *Hernandez v. Johnson Press Corp.*, 70 Ill.App.3d 664, 26 Ill.Dec. 777, 388 N.E.2d 778 (Ill.App. 1 Dist.1979) (applying Illinois law)).[9]

XLNT acknowledges that the Superior Court had previously held that not all of the *de facto* merger factors need be present in order to establish a *de facto* merger, including the continuity of ownership factor. XLNT contends, however,

9. XLNT also turns one of Appellant's arguments on its head by arguing that the continuity of ownership factor is necessary for determining corporate successor liability in order to prove that a corporation had simply "changed hats" so as to frustrate the rights of minority shareholders or creditors. XLNT's Brief at 13–15 (citing, *e.g., Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25 (1958); and *Schneider II, supra* ).

that the ultimate derivation of this principle came from "dicta" from New Jersey Superior Court decisions of the 1960s.[10] XLNT further argues that those cases in Pennsylvania and elsewhere that have held that not all *de facto* merger factors need be proven are distinguishable from the instant case by their facts and by their specific causes of action. XLNT's Brief at 18–24 (citing *Schneider I, supra; Lavelle, supra;* and *Fiber–Lite Corp. v. Molded Acoustical Products of Easton, Inc.,* 186 B.R. 603 (E.D.Pa.1994)).

XLNT is correct in noting that there is a split among jurisdictions, indeed, even among court decisions within the same jurisdiction, concerning whether the continuity of ownership factor is always required in *de facto* merger cases. Further, as XLNT also acknowledges and Appellant observes, our Superior Court, prior to its decision in the instant case, has never made continuity of ownership the key factor for determining the existence of a *de facto* merger. *See Schneider I, supra* at 135; *Lavelle, supra* at 227. Thus, we begin by exploring the discrepancies and peculiarities among existing case law to lay the groundwork for our ultimate holding.

Preliminarily, we note that this Court has previously discussed the nature and applicability of the *de facto* merger exception in *Farris v. Glen Alden Corp.,* 393 Pa. 427, 143 A.2d 25 (1958), albeit in the context of the rights of dissenting shareholders. There, we noted that, by the time of our decision, *i.e.,* 1958, it was no longer easy for courts to differentiate between a "merger" and simple "sale of assets" because of the increased sophistication of corporate agreements designed to avoid adverse consequences or to obtain beneficial treatment under state and federal statutory and regulatory laws. We stated:

Thus, it is no longer helpful to consider an individual transaction in the abstract[;] and[,] solely by reference to the various elements therein[,] determine whether it is a "merger" or a "sale," Instead, to determine properly the

10. XLNT cites *Applestein v. United Board & Carton Corp.,* 60 N.J.Super. 333, 159 A.2d 146 (Ch.1960); and *Good v. Lackawanna Leather Co.,* 96 N.J.Super. 439, 233 A.2d 201 (Ch.1967).

nature of a corporate transaction, we must refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable. *Id.* at 28.

Concerning the particular facts of the reorganization agreement at issue in *Farris,* we observed that the consequence of this agreement would be that the plaintiff shareholder would find himself an unwilling investor in a vastly different business and would suffer a serious diminution of the value of his corporate holdings, even though the transaction had not been conducted as a statutory merger. We held:

So, as in the present case, when as part of a transaction between two corporations, one corporation dissolves, its liabilities are assumed by the survivor, its executives and directors take over the management and control of the survivor, and, as consideration for the transfer, its stockholders acquire a majority of the shares of stock of the survivor, then the transaction is no longer simply a purchase of assets or acquisition of property ..., but a merger governed by ... the corporation law[ ] ... although consummated by contract rather than in accordance with the statutory procedure [for merger].

*Id.* at 31.

Although in *Farris* we upheld the trial court's imposition of liability under the *de facto* merger exception, we did not establish a test for *de facto* merger, nor did we discuss whether any one particular factor was essential to establish a *de facto* merger.

Details regarding the nature of the *de facto* merger exception were later fleshed out by the Superior Court in several cases. In 1989, an *en banc* panel of that court held:

For a *de facto* merger to occur, there must be continuity of the successor and predecessor corporation as evidenced by (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the suc-

cessor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor, and (4) a continuity of management, personnel, physical location, aspects, and general business operation. Not all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto* merger.

*Lavelle,* 555 A.2d at 227–28 (quoting *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (S.D.N.Y.1985)).

Reviewing relevant case law from other jurisdictions, it generally appears that the difference between those courts that require a continuity of ownership for a *de facto* merger analysis and those that do not depends on how these courts view the essential nature and purpose of corporate successor liability, particularly in relationship to the underlying cause of action. As XLNT points out in its brief, those decisions that have relaxed or waived any requirement of commonality of ownership under the *de facto* merger exception mostly (but not always) do **not** involve causes of action arising, as here, under contract or corporate law; rather, they are rooted in criminal or tort law, or law involving some other overarching matter of public policy.

*Lavelle,* for example, concerned the issue of whether a successor corporation could be held criminally liable under the corrupt organizations statute [11] for violations committed by the predecessor corporation, from which it had purchased all or most of its assets.[12] The *en banc* panel of the Superior Court stated that the issue was "whether a *de facto* successor corporation can be held criminally liable for acts of its predecessor in interest. . . ." *Lavelle, supra* at 225. Reviewing the evidence under the four *de facto* merger factors, the court concluded that all but continuity of ownership were formally met. However, on closer inspection, the court determined that although the sole shareholder of the predecessor corpora-

11. 18 Pa.C.S. § 911.

12. The predecessor corporation, an industrial refuse hauling and disposing concern, had illegally dumped wastes in violation of the controlling statute.

tion did not own shares in the successor corporation, his family members owned the successor corporation and, as an officer of the successor corporation, he drew a salary that dwarfed that of the successor corporation's other officer, his son. Under these circumstances, the court concluded (1) that it was irrelevant that there was no formal continuity of ownership between the corporations, as "an undisclosed [continuing] ownership interest" was plainly evident; and (2) the fraudulent transaction exception to corporate successor liability equally applied to support the imposition of criminal liability on the successor corporation. *Id.* at 230.

*Lavelle* cited several decisions from other jurisdictions in support of the proposition that the absence of common legal ownership is not an impediment to finding the asset-purchasing corporation as the *de facto* successor corporation to the asset-selling corporation. *See Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976); *Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3d Cir.1974); and *Lumbard, supra. Turner* and *Knapp* concerned products liability causes of action; *Lumbard* concerned, among other things, a fraudulent transfer of assets cause of action.

Many relevant cases from other jurisdictions that have taken a relaxed approach to the requirement of continuity of ownership or an exchange of shares under the *de facto* merger exception are products liability cases. As such, they emphasize the dominant public policy interests of products liability law in justifying the relaxation or waiver of the commonality of ownership prong of the *de facto* merger exception. As the New Jersey Supreme Court stated:

In recent years ... the traditional corporate approach [which, as discussed *infra,* would **not** relax the requirement of common ownership under the *de facto* merger exception] has been sharply criticized as being inconsistent with the rapidly developing principles of strict liability in tort and unresponsive to the legitimate interests of the products liability plaintiff. Courts have come to recognize that the traditional rule of nonliability was developed not in response to the interests of parties to products liability actions, but

rather to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor.

\* \* \*

In an effort to make the traditional corporate approach more responsive to the problems associated with the developing law of strict products liability[,] several courts have broadened the [traditional] exceptions of *"de facto* merger" and "mere continuation" in order to expand corporate successor liability in certain situations.

*Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 341–43, 431 A.2d 811, 815–17 (1981).[13]

Thus, in *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir.1974) (applying New Hampshire law), the First Circuit Court of Appeals determined that there was sufficient justification for a jury to find the successor corporation to be the mere continuation of its predecessor for purposes of imposing tort liability for injuries caused by defective products where the successor corporation continued to produce the same product, through the same employees, in the same physical plant, under the same supervision as its predecessor, and under essentially the same name as its predecessor, thus, publicly holding itself out to be the same enterprise. However, the underlying transaction was an asset sale where no shares of stock were exchanged and where the asset purchase agreement provided that the purchasing corporation would not assume the liabilities of the selling corporation. The *Cyr* court justified its holding on the public policy considerations underlying strict products liability, including issues of risk-

13. As suggested by the quotation from *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 343, 431 A.2d 811, 817 (1981), many courts treat the *de facto* merger and mere continuation theories of corporate successor liability identically. *See Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F.Supp. 328, 336 (D.Mass.1995); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 275 (D.N.J.1994); *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1535 (S.D.N.Y.1985). Indeed, our Superior Court has noted that the *de facto* merger and mere continuation theories of corporate successor liability "are difficult to distinguish." *Lavelle, supra* at 227.

spreading. *See id.* at 1154: *accord Turner, supra* at 423, 244 N.W.2d at 880 ("[T]here is no basis for treating a purchase of corporate assets different[ly] from a *de facto* merger. Both the injured party and the transferee corporation have common goals in each situation. It would make better sense if the law had a common result and allowed products liability recovery in each case.").

In *Knapp, supra,* the Third Circuit Court of Appeals opined that this Court would, when presented with the appropriate case, permit products liability actions to proceed against successor corporations under the *de facto* merger exception, despite lack of indicia of an actual merger,[14] pursuant to the policy consideration of spreading the risk. The *Knapp* court based its analysis on pronouncements made by this Court in *Farris, supra,* wherein we emphasized that a court must look beyond the formalities of the underlying corporate transaction in order to consider its consequences. *Knapp,* 506 F.2d at 368 (citing *Farris,* 143 A.2d at 28).[15]

Finally, courts from other jurisdictions have noted that the relaxed approach to the *de facto* merger exception has been applied where causes of action raise public policy concerns other than those concerning products liability. "Courts in various jurisdictions, including Indiana, have relaxed successor liability requirements in certain limited contexts, for example, to address injuries caused by defective products manufactured by a predecessor corporation or to vindicate policies incorpo-

14. In *Knapp,* however, the corporate seller had received stock in the successor corporation as payment for the sale of substantially all of its assets, and the stock was to be distributed to the seller's shareholders upon its eventual dissolution, which came approximately eighteen months after the sale of assets.

15. Other courts have rejected expansion of the *de facto* merger and mere continuation theories of corporate successor liability, but still permitted products liability actions to proceed against a purchaser of the assets of the corporation that had originally placed the defective product into the stream of commerce. These courts, including our Superior Court, allowed causes of action to proceed against successor corporations under an entirely new and different theory of corporate successor liability known as the "product-line exception." *See Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106, 109–11 (1981): *see also Schmidt v. Boardman Co.,* 608 Pa. 327, 11 A.3d 924 (2011).

rated in federal statutes in areas such as labor law, environmental law[,] and employment discrimination law." *Glentel, Inc. v. Wireless Ventures, LLC,* 362 F.Supp.2d 992, 1001 n. 20 (N.D.Ind.2005) (citing cases).

However, when the underlying cause of action is not one that implicates certain public policy concerns, but rather is rooted in contract or corporate law, as in this case,[16] the courts of other jurisdictions have notably adhered to the "traditional"[17] or "more conservative stance"[18] that for the *de facto* merger exception to be recognized, continuity of ownership between the predecessor and successor corporations must be shown. *See, e.g., Cargo Partner AG,* 352 F.3d at 46–47 ("[W]e are confident that the doctrine of *de facto* merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership.... [C]ontinuity of ownership is the essence of a merger."); *Washington Mut. Bank, F.A. v. SIB Mortg. Corp.,* 21 A.D.3d 953, 954, 801 N.Y.S.2d 821, 822 (N.Y.App.Div.2005) ("[I]n non-tort actions, continuity of ownership is the essence of a merger."); *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458 (11th Cir.1985) (applying Georgia law: "[A] consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities.... At the very least, there must be some sort of continuation of the stockholders' ownership interests."); *Travis,* 565 F.2d at 447 (applying Ohio and Indiana law: "A major factor in support of a finding of *de facto* merger is a transfer of stock as consideration.... Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger."); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 439 (7th Cir.1977) (applying Wisconsin law: "[A] '*de facto* merger' may be found if the consideration given by the

16. The issues in this appeal concern only Appellant's allegations of breach of contract and breach of express warranty, not those concerning a fraudulent transfer of assets, which were rejected by the trial court.

17. *Ramirez, supra* at 341, 431 A.2d at 816.

18. *Glentel, Inc. v. Wireless Ventures, LLC,* 362 F.Supp.2d 992, 1003 (N.D.Ind.2005).

purchaser corporation be shares of its own stock."); *Forrest v. Beloit Corp.*, 278 F.Supp.2d 471, 476 (E.D.Pa.2003) ("[T]he transfer of stock is a key element in finding a *de facto* merger because it represents continuity of ownership."); *Tracey*, 745 F.Supp. at 1110 (in rejecting the "product-line" exception, holding that stock ownership is the "essential element" of the *de facto* merger exception); *Ramirez*, 86 N.J. at 342, 431 A.2d at 816 ("Traditionally, the triggering of the '*de facto* merger' exception has been held to depend on whether the assets were transferred to the acquiring corporation for shares of stock or for cash[;] that is, whether the stockholders of the selling corporation become the stockholders of the purchasing corporation."); *Good v. Lackawanna Leather Co.*, 96 N.J.Super. 439, 452, 233 A.2d 201, 208 (Ch.1967) ("A consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities," describing continuity of ownership as a "key element" of the *de facto* merger exception.).

 The philosophical underpinnings of those courts that require the continuity of ownership element in recognizing a *de facto* merger are firmly rooted in general principles of commercial and corporate law. As stated by the Eleventh Circuit Court of Appeals:

Several courts have held that "[a] consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities." At the very least, there must be some sort of continuation of the stockholders' ownership interests. The reason for this requirement is that corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself. The corporate entity and its shareholders ultimately are responsible for the disposition of the corporation's assets and the payment of its debts. Even if the corporation sells to another corporation its entire business operation and all its assets, in exchange for some consideration other than stock, the two corporate entities remain distinct and intact. The corporate entities have not merged, and each is

liable for its own debts, absent fraud or one of the other exceptions [to successor liability] listed above.

*Bud Antle, supra* at 1458 (citations and footnote omitted).

Other courts have noted that any expansion of the "traditional" or "more conservative" approaches to the issue of continuity of ownership under either the *de facto* merger or mere continuation exceptions would have a "chilling effect" on commercial transactions and would undermine "the general policy of encouraging the productive use of economic assets through free alienability." *Glentel, supra* at 1003, 1004; *see also Gallenberq Equip., Inc. v. Agromac Int'l., Inc.,* 10 F.Supp.2d 1050, 1055–56 (E.D.Wis.1998). Thus, these courts have criticized "unjustifiably relaxing the traditional test of successor liability and importing the continuity of enterprise doctrine from the product liability context into commercial law." *Glentel, supra* at 1003 (quotation marks omitted); *see also Gallenberq, supra* at 1055.

However, some courts, even where the underlying cause of action is in contract or commercial law, have taken a different approach and would not require the existence of any particular *de facto* merger prong, including continuity of ownership, although each prong would be considered in the analysis. *See, e.g. Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir.1993) (applying New Jersey law) ("The crucial inquiry is whether there was an intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets."); *Glynwed, Inc. v. Plastimatic, Inc.,* 869 F.Supp. 265, 275–77 (D.N.J.1994) (same, but finding that the continuity of ownership prong was met where a **minority** of the predecessor corporation's shareholders owned stock in the successor corporation, stating: "Continuity of ownership, not uniformity, is the test."); *Fiber–Lite, supra* at 609–11 (holding that although the successor corporation purchased the assets of the predecessor corporation from a third party through the foreclosure statute, the successor corporation would nevertheless be responsible for the predecessor corporation's debt where the shareholder of the predecessor corporation was the president and the father of the sharehold-

ers of the successor corporation, and the transaction appeared to be orchestrated by a creditor bank of the predecessor corporation with the intent to rid the predecessor of other debt).

The question this Court accepted for review could suggest the need to devise a broad holding to answer the question: "Does the *de facto* merger doctrine always require proof of continuity of ownership?" *Fizzano Bros.*, 994 A.2d 1081. Based on the above case law, or at least the majority of it, a broad holding could state that when the underlying cause of action is contractual or commercial in nature, the *de facto* merger exception does require a strict continuity of ownership, but where the underlying cause of action is rooted in a cause of action that invokes important public policy goals, the continuity of ownership prong may be relaxed.

However, the better course requires that we tailor our holding to the narrow facts of the case *sub judice*, and use the above analysis for background and guidance. For one, this case does not concern an underlying cause of action that implicates issues of overarching public policy. Indeed, this Court has never adopted an expansion of corporate successor liability to accommodate such cases. Therefore, it would be improper to articulate a holding that would govern aspects of, or exceptions to, the law of corporate successor liability that this Court has not had occasion to recognize.[19]

Further, although the majority of the case law that we have reviewed from other jurisdictions would support a rigid holding that where, as here, the underlying cause of action is in contract or breach of warranty, continuity of ownership would be a necessary factor for establishing a *de facto* merger, we

19. In *Schmidt*, 11 A.3d 924, this Court was asked to rule upon the Superior Court's adoption of the product-line exception in *Dawejko*, 434 A.2d 106. However, procedural matters in *Schmidt* obviated the necessity for this Court to then rule upon whether the product-line exception should continue as the law of the Commonwealth. *Id.* at 941. Further, as previously noted, the product-line exception is not an expansion of the *de facto* merger and mere continuation theories of corporate successor liability, but an entirely different theory of corporate successor liability. Here, we are concerned only with the *de facto* merger exception.

resist a mechanical, un-nuanced ruling for several reasons. First, many of the cases cited *supra* hold that continuity of ownership, as evidenced by an exchange of shares, is an indispensable requirement for the recognition of a *de facto* merger because such form of continuity of ownership is a circumstance present in *de jure* mergers effected through statutory law. However, our statutory law does not contemplate such a limited view.

The Business Corporation Law of 1988 ("the Corporation Law") sets forth the elements of a statutory merger.[20] *See* 15 Pa.C.S. §§ 1921–1932. These provisions relevantly authorize the merger of any two corporations into one of the domestic business corporations participating in the merger, which shall be the surviving corporation. 15 Pa.C.S. § 1921(a). Consolidation of two or more corporations into a new corporation formed under the Corporation Law may also be effected. *Id.* The Corporation Law contemplates that a plan of merger or consolidation shall include the manner of conversion of shares of the predecessor corporation(s) for shares **"or obligations"** of the surviving corporation. 15 Pa.C.S. § 1922(a)(3) (emphasis added). Additionally, "if any of the shares of any of the corporations that are parties to the merger or consolidation are not to be converted solely into shares or other securities **or obligations** of the surviving or new corporation, [the plan shall also include a description of] the shares or other securities or obligations of any other person **or cash, property or rights** that the holders of such shares are to receive in

20. "Merger" itself is not defined by the Corporation Law. It has been defined elsewhere as the "uniting of two or more corporations by the transfer of property to one of them, which continues in existence, the others being merged into it." 15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7041 (perm.ed., rev.vol. 2004); *see also* 9 P.L.E. Corporations § 471. "In a merger, one or more constituent corporations (each a disappearing corporation) merge into and become part of another constituent corporation that continues to exist after the merger has been consummated." John W. McLamb, Jr. and Wendy C. Shiber, Pennsylvania Corporate Law and Practice § 9.3[b] (1993 Supplement). *See Seven Springs Farm, Inc. v. Croker,* 748 A.2d 740, 746–47 (Pa.Super.2000) (*en banc*). *aff'd,* 569 Pa. 202, 801 A.2d 1212 (2002).

exchange for, or upon conversion of, such shares." *Id.* (emphases added).[21]

Because the Corporation Law does not **always** require an exchange of shares, for a statutory merger (shareholders of the predecessor corporation may surrender their shares of stock for "obligations" of the successor corporation or, in partial manner, "cash, property, or rights" in lieu of shares in the successor corporation), it would be incongruous to adopt a blanket rule that a *de facto* merger **would always** require a rigid showing that the shareholders of the predecessor corporation have exchanged their ownership interests for shares of the successor corporation. We find the analysis of the Eleventh Circuit Court of Appeals in *Bud Antle, supra* at 1458, quoted above, instructive on this point. That court rejected the notion that a merger always involves a transfer of the assets from one corporation to another in exchange for its securities. However, we agree with this court that a *de facto* merger must show "some sort of continuation of the stockholders' ownership." *Id.* This is because "corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself. The corporate entity and its shareholders ultimately are responsible for the disposition of the corporation's assets and the payment of its debts." *Id.* However, because a *de facto* merger analysis tasks a court with determining whether, for all intents and purposes, a merger or consolidation of corporations has occurred, even though the

---

**21.** Specifically, Section 1922(a)(3) provides that a plan of merger or consolidation shall set forth:

(3) The manner and basis of converting the shares of each corporation into shares or other securities or obligations of the surviving or new corporation, as the case may be, and, if any of the shares of any of the corporations that are parties to the merger or consolidation are not to be converted solely into shares or other securities or obligations of the surviving or new corporation, the shares or other securities or obligations of any other person or cash, property or rights that the holders of such shares are to receive in exchange for, or upon conversion of, such shares, and the surrender of any certificates evidencing them, which securities or obligations, if any, of any other person or cash, property or rights may be in addition to or in lieu of the shares or other securities or obligations of the surviving or new corporation.

15 Pa.C.S. § 1922(a)(3).

statutory procedure had not been used, the continuity of ownership prong of the *de facto* merger analysis certainly may not be more restrictive than the relevant elements of a statutory merger as contemplated by our legislature.

Secondly, a *de facto* merger analysis, as viewed by this Court in *Farris, supra,* and by the Superior Court in several decisions prior to the instant case, requires that a court look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences. *See id.* at 28 ("[T]o determine properly the nature of a corporate transaction, we must refer ... to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable."); *see also Gallenberq, supra* at 1054 ("Courts will give close scrutiny to corporate realities, not mechanical application of a multi-factor test."); *Kaiser Foundation Health Plan of Mid–Atlantic States v. Clary & Moore, P.C.,* 123 F.3d 201, 206 (4th Cir.1997) ("We cannot allow a corporation which, by all indications is under the same control as its predecessor, to avoid its legitimate debts by manipulating superficial indicia of ownership."). As then-Judge of the Third Circuit Court of Appeals, Samuel A. Alito, Jr., observed: "The *de facto* merger exception is not strictly contractual because it is an **equitable principle,** ultimately designed to look beyond the contract." *Berg Chilling Systems,* 435 F.3d at 465 (emphasis added).

As various cases have revealed, transactional realities sometimes require a scrutiny that extends the focus beyond the confines of the immediate consequences of the proximal asset purchase agreement. *See Schneider II,* 873 A.2d at 1294 ("[N]either the UCC itself nor the policy underlying it demands the imposition of an absolute bar to an unsecured creditor's assertion of a successor liability claim against an entity that has purchased the debtor's assets in a [commercially reasonable] foreclosure sale. Rather, we conclude that such claims may proceed[,] and if the unsecured creditor can establish that one of the exceptions to the general rule against successor liability applies, it may collect the predecessor's debt from the successor."); *Glynwed, supra* at 274 (same); *Glentel,*

*supra* at 999–1000 (same); *Fiber–Lite, supra* at 609–10 (substantially the same). The lessons from these cases militate against a mechanical application of the continuity of ownership prong of the *de facto* merger exception, even where some cases may also fall under another theory of corporate successor liability, such as fraudulent or inadequately-funded transfers. *See Lavelle, supra* at 230 (determining liability under both the *de facto* merger exception and the fraudulent transaction exception to the general rule of corporate non-liability of a transferee corporation).

 Accordingly, we hold that in cases rooted in breach of contract and express warranty, the *de facto* merger exception requires "some sort of" proof of continuity of ownership or stockholder interest. *Bud Antle, supra* at 1458. However, such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice; indeed 15 Pa.C.S. § 1922(a)(3) contemplates that continuing shareholder interest pursuant to a statutory merger may take the form of "obligations" in lieu of shares in the new or surviving corporation. Further, *de facto* merger, including its continuity of ownership prong, will always be subject to the fact-specific nature of the particular underlying corporate realities and will not always be evident from the formalities of the proximal corporate transaction. These realities may include an issue concerning which entity is actually the true predecessor corporation. *See Lavelle, supra* at 230 (citation omitted) ("The issue of sufficient degree of identity is one that must be resolved on a case-by-case basis."). Finally, the elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure. *See Farris, supra* at 28, 31.

■ Turning to the facts of the instant case, we observe that the underlying cause of action arose from a contract entered into between Appellant and SDG. The four Shareholders of SDG sold their shares to XLN, a corporation owned by investment companies. In exchange, the Shareholders received, in addition to some cash, promissory notes evidencing a considerable debt obligation of XLN, which obligation was secured by the primary asset of value for that corporation, namely, the Software. Indeed, this particular asset **was** the business. When XLN sold its assets to XLNT, which was also formed to invest in the Software, XLN was relieved of its debt obligation under the promissory notes and XLNT assumed, through renegotiated promissory notes with the Shareholders, this considerable corporate debt obligation. Once again, the obligation was secured by the critical asset for this new corporation, namely the Software. The two principal Shareholders of SDG held positions of importance with both XLN and XLNT. Both XLN and XLNT were evidently formed simply to invest in the development and licensing of the Software, which remained the property of the Shareholders throughout the relevant timeframe.

The record demonstrates a continuity of **the business** formed by the Shareholders and originating in SDG. Fritsch, a principal Shareholder of SDG, testified at trial that he and the other principal Shareholder, Hamlin, became involved in negotiations with Montgomery prior to the asset sale between XLN and XLNT "to salvage our company. The company, the company that we had started." N.T., 10/23/06, at 58; *see also id.* at 59. Similarly, Hamlin testified with respect to his negotiations with Montgomery over the transfer of the right to license the Software to XLNT: "We had this asset, we the [S]hareholders had this asset, the source code. We had a note. They [XLN] weren't paying. . . . I was trying to serve my business needs, and the concern of the company." N.T., 10/24/06, at 17–18.

Based on all of the evidence adduced at trial, the trial court discerned a corporate continuum from SDG, which had the contract with Appellant, to XLNT. *See* Trial Court Opinion, Findings of Fact Nos. 35–43. That is, the Shareholders

surrendered their shares in SDG in return for secured promissory notes of considerable value, which were ultimately transferred to XLNT. The "company," as referred to by Fritsch and Hamlin in their testimony, moved from SDG to XLN to XLNT. In contrast to the trial court, the Superior Court narrowly focused on whether XLN and XLNT had common shareholders.

We appreciate the Superior Court's attempt to adhere to the stated elements of the *de facto* merger exception; however, by its taking a narrow and mechanical view of the continuity of ownership prong, the court erred. This error lay in (1) restricting the proof of continuity of ownership to evidence of an exchange of assets or stock shares from one corporation for shares in the successor corporation; and (2) narrowly focusing on the formalities of one piece of the transactional reality (the sale of assets from XLN to XLNT), thus, ignoring the instructions and lessons from this Court in *Farris, supra,* and the guidance from courts of other jurisdictions, as cited above.

We do not opine, under this issue, or the second one, as to whether the facts found by the trial court support the conclusion that a *de facto* merger had occurred that would permit an obligation of SDG, once assumed by XLN, to be determined the responsibility of XLNT, nor are we suggesting a result. However, based on the above, and with a focus upon substance over form where corporate transactions are concerned, as recognized by this Court in *Farris, supra,* we reject the narrow application of the continuity of ownership prong adopted by the Superior Court in this case. Continuity of ownership or stockholder interest in some form must be shown,[22] but the manner by which it may be shown is more extensive and attuned to the transactional realities than the Superior Court's holding supports.

## V. *FACT-FINDING ON APPELLATE REVIEW*

 Our second issue pertains solely to the other three prongs of the *de facto* merger exception: (1) a cessation of

---

**22.** The issue of the degree of continuity of ownership or stockholder interest that must be proved is not before us.

ordinary business and dissolution of the predecessor as soon as practically and legally possible; (2) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (3) a continuity of management, personnel, physical location, aspects, and general business operation. *Lavelle, supra* at 227–28. The trial court found that the evidence established each of these prongs. The Superior Court determined that the evidence of record did **not** establish these prongs. The question raised by Appellant is whether the Superior Court improperly made its own factual findings, and substituted such "findings" for those of the trial court, in arriving at this determination.[23]

Of these three prongs, the one upon which the Superior Court placed its primary emphasis was whether the predecessor corporation had a continued existence. *See Fizzano Bros., supra* at 1023. Both the trial court and the Superior Court focused on XLN as the predecessor corporation. XLN did survive as a corporate entity for a period of time after the date of the asset purchase. However, the trial court determined that the cessation of ordinary business prong was met based on credible evidence that because of the asset purchase agreement, XLN "essentially ceased operating;" had ultimately become "dormant," by the admission of its CEO and one of its shareholders, David Binder; and, "can be considered out of business." Trial Court Opinion, Conclusion of Law No. 17. Although XLN did change its name pursuant to the asset purchase agreement with XLNT, and had retained two customers, the trial court found that the T–Rex software retained by XLN "had no functionality," and that XLNT had hired XLN's remaining employee. *Id.*, Findings of Fact Nos. 33, 38.

The Superior Court, however, held:

The record on appeal [ ] does not reflect that either XLN or XLNT had any intention that XLN would cease operations and end its corporate existence as soon as legally and practically possible after the sale of assets. To the con-

---

**23.** The trial court's factual findings and the Superior Court's review of those findings are summarized, respectively, in parts II and III *supra*.

trary, XLN not only remained in business after the sale (changing its name to XE Corporation) but also retained two customers (Genco Distribution Systems and Novartis Pharmaceutical Corp.), along with the physical and intellectual property assets necessary to service them (including computer equipment and the source code for the T–Rex derivative software). Plaintiffs Exhibit 1. Far from conveying any understanding by the parties that XLN would cease its business activities, the Asset Purchase Agreement even includes a covenant not to compete forbidding XLN from marketing its products to, *inter alia*, former SDG or XLN customers.

*Fizzano Bros.*, 973 A.2d at 1022.

It would appear that the Superior Court made factual findings contravening those of the trial court. The Superior Court found that XLN had "the physical and intellectual property assets necessary to service [two retained customers] (including computer equipment and the source code for the T–Rex derivative software)." *Id.* However, the trial court found that the T–Rex derivative software was undeveloped and "had no functionality." Trial Court Opinion, Finding of Fact No. 33. Further, the trial court found that XLNT had hired XLN's remaining employee. *Id.*, Finding of Fact No. 38. These factual findings of trial court are supported by testimony in the record. *See* N.T., 10/24/06, at 35, 200–01.

Further, the Superior Court's analysis appears to contradict the trial court's factual finding that XLN became dormant and ceased operations because of the asset purchase agreement. Again, the trial court's factual findings are supported by the record. *See* N.T., 10/24/06, at 85. Indeed, XLN's president, David Binder, testified that "we just closed the company down," apparently a "few weeks" after the asset sale. *Id.* The Superior Court asserted that XLN "remained in business after the sale." *Fizzano Bros.*, 973 A.2d at 1022. Accordingly, the Superior Court erred to the extent that it did make factual findings different from the trial court on these matters.

■ The remainder of the Superior Court's analysis on this issue seems less a dispute over the factual record than a dispute over the legal requirements of the cessation of ordinary business prong of the *de facto* merger exception. That is, the Superior Court determined that an important consideration for this prong was the intent of the two corporations as evidenced by the asset purchase agreement. The trial court did not make any factual findings pertaining to the intent of the parties to the agreement. We are unsure why the issue of intent as evidenced from the asset purchase agreement is consequential when a *de facto* merger analysis requires that a court look beyond the mere formalities of a transaction; however, such question of law is not before us. To the extent the issue of intent is important, the appropriate course would have been for the Superior Court to remand to the trial court to make the necessary findings on what appears to be a factual question.

■ The next prong concerns assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor. For this prong, the trial court concluded from the record that "XLNT clearly assumed all of the obligations of XLN that were ordinarily necessary for the uninterrupted continuation of normal business operations." Trial Court Opinion, Conclusion of Law No. 18. These obligations included the lease of the work premises, payment of salary to the same key employees, servicing the same clients, assuming a debt owed to one of the clients, and taking "responsibility for XLN's accounts receivable." *Id.*, Conclusion of Law No. 19. Further, the court noted that the most significant obligation of XLN that was assumed by XLNT was the debt owed for the Software, which was the asset vital to the operation of XLNT's business and had been the asset vital to the operation of XLN's business. *Id.*, Conclusion of Law No. 20.

The Superior Court, however, held as follows:

With respect to the third factor, assumption of liabilities ordinarily necessary for uninterrupted continuation of the business, the factual basis for this factor does not appear to

have been extensively developed by either party. The trial court noted only that XLNT spent significant time and money to resolve issues with former XLN customer Cardinal IG. In the Asset Purchase Agreement, however, XLNT specifically assumed the obligation for remediation of problems with Cardinal IG while expressly disclaiming responsibility for XLN's other liabilities.

*Fizzano Bros.*, 973 A.2d at 1022 (citations to the Trial Court Opinion and footnote omitted).

Based on the above, it would appear that the Superior Court disregarded the trial court's actual factual findings and legal conclusions on this prong, and instead shifted the focus to the trial court's ancillary concern that XLNT did not address Appellant's claim in the manner that it addressed the claim made by another XLN customer. The trial court's central conclusions, however, are based on its factual findings that are supported by the record. *See* Trial Court Opinion, Findings of Fact Nos. 25–26, 36–40 (citing to the record). Indeed, there does not appear to be any dispute among the parties that XLNT bought nearly all of XLN's assets, assumed the remaining debt for the Software purchase, hired XLN's current and former employees and consultants, and set up shop in the same location as XLN, assuming the lease there and holding itself out as the successor to XLN. Thus, the Superior Court is clearly incorrect that the record was not developed for this prong, and it erred by disregarding the trial court's essential findings and the support for them in the record.

The final prong concerns the continuity of management, personnel, physical location, aspects, and general business operation. Many of these elements overlap with those of the previous prong. The trial court found that (1) there was an undisputed continuation of physical location, passed from SDG to XLN to XLNT; (2) XLNT acquired all of the assets of XLN, except for XLN's stock, two customers, and two computer servers with workstations; (3) the Software continued to be owned by the Shareholders under both XLN and XLNT until the purchase price was fully paid; and (4) the general business operations of XLN and XLNT were the same, involv-

ing the same essential personnel, key asset, customers (except for the two retained by XLN), and office location. Moreover, the trial court concluded that there was a continuation of management because XLNT retained the "key personnel," Hamlin and Fritsch; Hamlin as Chief Operating Officer, controlling day-to-day operations, and Fritsch as Chief Technology Officer, controlling XLNT's technology issues. *Id.,* Conclusion of Law No. 11. Additionally, the trial court noted that XLNT hired XLN's only remaining employee and made him the General Manager. *Id.,* Conclusion of Law No. 12.

The Superior Court acknowledged that the record supports the trial court's finding regarding the continuity of general business operations. However, the court determined that this finding was of no moment, noting that a continuity of business operations was not a surprising result where there has been a general asset purchase. Rather, the court emphasized, regarding this prong, that the factual record does not support the trial court's findings concerning a continuity of management. The court held:

Again, however, the record on appeal does not support these findings, at least with regard to continuity of management. The record contains no information regarding the identities of the members of XLN's board of directors, and thus provides no basis for determining whether there was any overlap between the directors of XLN and XLNT. And other than Binder, identified as XLN's CEO, there is likewise no information in the record regarding the identity of the officers of XLN at the time of the sale of assets, and thus no basis for determining any connections between XLN officers and XLNT. After the sale, Binder had no continuing role at XLNT.

The trial court pointed out that two former employees of XLN, Hamlin and Fritsch, were hired by XLNT in connection with the sale of assets. At the time of the sale of assets, however, Hamlin and Fritsch were no longer employees of XLN, their employment having been terminated several months prior to the transaction. As such, XLNT's employment of Hamlin and Fritsch provides no support for

a finding of a *continuation* of personnel. Moreover, while recognizing that Hamlin and Fritsch "had a direct part in the day-to-day operations of XLNT," the trial court also acknowledged that the evidence at trial demonstrated that neither of them had any "power to make legal and/or personnel decisions on XLNT's behalf." Trial Court Opinion, 11/7/07, at 18. As a result, XLNT's employment of Hamlin and Fritsch, without more, did not establish a continuity of management and personnel required to support a *de facto* merger claim.

*Fizzano Bros.*, 973 A.2d at 1022–23 (emphasis in original; footnote omitted).

In a footnote, the Superior Court noted:

Hamlin's title at XLNT was "Chief Operating Officer" and Fritsch's was "Chief Technology Officer". N.T., 10/23/06, at 99–102. Although these titles suggest they were both officers at XLNT, as noted above neither had any authority to make legal and/or personnel decisions on XLNT's behalf. Likewise, it is not clear that they held officer positions at XLN either, as their employment contracts with XLNT both provided that "Employee has no authority, either express or implied, to act on behalf of XLN in any matter without express written consent and permission from an officer of XLN." Defendants' Exhibits 13, 14.

*Id.* at 1023 n. 5.

Here, it would appear that the discrepancy between the Superior Court and the trial court on the issue of management is more about how to interpret this matter in a *de facto* merger analysis than it is a difference over the factual record. That is, the two courts are not at odds over what the record shows concerning the composition of the corporations' respective boards of directors or chief executive officers. Further, the Superior Court does not dispute that the record supports the trial court's finding that Hamlin and Fritsch were officers of XLNT.

However, the Superior Court does not explain why it would have been necessary for Appellant to show that Hamlin and

Fritsch made an **immediate** transition from XLN to XLNT in order to prove a *de facto* merger. Further, it is unclear from its opinion what weight the Superior Court gave to the circumstance of the lack of common higher management between XLN and XLNT. However, such questions are beyond the scope of the issue taken on appeal, which concerns a question of fact-finding. Except to the extent the Superior Court apparently discounted the trial court's factual finding that some continuity of management occurred with XLNT's hiring of Hamlin and Fritsch as officers, the Superior Court did not improperly engage in fact-finding in this final issue.

The order of the Superior Court must be vacated because it erred by (1) applying an overly-narrow and mechanical continuity of ownership analysis; and (2) substituting its own factual findings for those of the trial court in several instances in its review of the remaining prongs of the *de facto* merger exception. Accordingly, the Superior Court's order is vacated, and this matter is remanded for proceedings consistent with this opinion.

Chief Justice CASTILLE, Justices EAKIN, TODD, and ORIE MELVIN join the opinion.

Justice BAER files a concurring and dissenting opinion.

Justice SAYLOR files a dissenting opinion.

Justice BAER, concurring and dissenting.

I join in full the majority's erudite opinion holding that the *de facto* merger exception requires "some sort of" proof of continuity of ownership or stockholder interest and that such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Maj. Op. at 271–74, 42 A.3d at 968–69. I agree with the majority that a statutory merger may take the form of "obligations" in lieu of shares in the new or surviving corporation and that the underlying corporate realities will not always be evident from the formalities of the proximal corporate transaction. *Id.* at 272–73, 42 A.3d at 969. Moreover, I believe the

majority correctly concludes that this type of analysis does not require adherence to a mechanically applied checklist as found by the Superior Court, but rather uses the relevant factors as a map to determine whether a merger of two corporate entities is the result of the transaction. Because I believe that the trial court's analysis of the facts of this case fulfill the analytical framework set forth by the majority, I would simply reverse the Superior Court's determination and reinstate the trial court's decision concluding that a *de facto* merger resulted in this case rather than remand for such a determination.

Specifically, as noted by the majority, the trial court concluded that given the realities of the transactions between SDG and XLN and XLN and XLNT there was a corporate continuum from SDG to XLNT. Maj. Op. at 272–74, 42 A.3d at 969. As also pointed out by the majority, and relied upon by the trial court, the facts demonstrate that Appellant's causes of action for breach of contract and breach of express warranty derived from a transaction between Appellant and SDG. Sometime following the above events, all of the SDG's shareholders sold their shares to XLN, a sale that unquestionably resulted in a corporate merger of SDG and XLN. In exchange, SDG's shareholders received cash and promissory notes obligating XLN to pay the shareholders a considerable debt on the notes. This obligation was secured by the primary asset of the corporation, its software (the Software). When XLN sold its assets to XLNT, XLN was relieved of its debt obligations to the SDG shareholders and XLNT assumed such obligation with the Software again serving as security for such obligation. Thus, the primary corporate asset, the Software, remained the property of the original SDG shareholders throughout the sales transactions from SDG to XLN and then to XLNT. Finally, the trial court noted that the record demonstrated the key employees and shareholders of SDG, Daniel Fritsch and Michael Hamlin, continued as key employees and owners of the main corporate asset, the Software, at XLNT. Thus, *inter alia*, although there was not a technical continuity of the shareholders from XLN to XLNT, the trial court found there was a *de facto* merger between XLN and XLNT.

In my view, the above facts found by the trial court likewise satisfy the analytical framework set forth by the majority for determining whether the continuity of ownership prong of the *de facto* merger test has been satisfied. Specifically, for all intents and purposes, the ownership of XLNT remained the same as the ownership of XLN given the assumed obligations of XLNT to Fritsch and Hamlin, in lieu of shares. Thus, despite the technical lack of shareholder continuity from XLN to XLNT, I would, nevertheless find continuity of ownership. Because the Superior Court concluded otherwise, I would simply reverse its decision and reinstate the trial court's determination.

Justice SAYLOR, dissenting.

I have difficulty with the looseness of the test the majority devises to govern *de facto* mergers, as I believe it diminishes the degree of certainty attaching to corporate transactions. On the merits, were this entirely a paper transaction, I might support the result obtained (albeit such a paper scenario would seem more similar to mere continuation rather than *de facto* merger, assuming absolute continuity of ownership should not be required under either theory). Here, however, the purchaser—a corporation with shareholders independent of the seller—paid more than $250,000 as part of the consideration in the relevant asset purchase transaction. *Cf.* 19 C.J.S. CORPORATIONS § 911 (2011) (opining that "[t]he crucial factor in determining whether there has been a de facto merger or continuation of business, resulting in successor liability, is whether adequate cash consideration was paid for the predecessor corporation's assets"). To the extent the Court dilutes the continuity of ownership inquiry, 1 believe it should include an element focusing on the cash consideration to guard against unfairness to stockholders in a purchasing company. Notably, there is no discussion in the briefs of any claim that the consideration provided by XLNT was inadequate in this regard.

On this record, to me, Appellant's claim against XLNT should rise or fall on the merits of its theory that the asset

purchase transaction entailed a fraudulent transfer. Notably, such theory was rejected by the trial court and is outside the scope of the present appeal.