J-S45003-24

2025 PA Super 44

| | | |
|---|---|---|
| JONATHAN CAMPBELL T/B/A CAMPBELL CROPS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WECARE ORGANICS LLC D/B/A WE CARE ORGANICS LLC AND DENALI WATER SOLUTIONS, LLC | : | No. 716 MDA 2024 |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: DENALI WATER SOLUTIONS, LLC | : | |
| | : | |

Appeal from the Judgment Entered April 22, 2024
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2019-CV-744

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

OPINION BY OLSON, J.:                    **FILED: FEBRUARY 25, 2025**

Appellant, Denali Water Solutions, LLC, ("Denali") appeals from the April 22, 2024 judgment entered in the Court of Common Pleas of Dauphin County. On appeal, Denali challenges the trial court's determination that, under a theory of successor liability, Jonathan Campbell, in his own right and t/d/b/a Campbell Crops (collectively "Campbell") was entitled to judgment against Denali in the amount of $120,472.00, together with pre-judgment and post-judgment interest.[1]  After careful review, we vacate the April 22, 2024

_____

[1] The April 22, 2024 judgment was entered in the amount of $120,427.00 plus pre-judgment interest from December 1, 2015, to August 25, 2020, and post-judgment interest beginning on August 25, 2020, at the applicable legal rates, as well as costs of suit.  The amount of the judgment, $120,427.00, appears to be a typographical error, as the partial judgment entered by the trial court was $120,472.00.  Nonetheless, $120,427.00 is the sum cited by

default judgment, together with the March 13, 2024 judgment, as well as the February 16, 2024 trial court order finding Denali liable to Campbell under the theory of successor liability. We remand this case for further proceedings in accordance with this decision.

By way of overview, Campbell filed a complaint on April 26, 2019. The complaint alleged that WeCare was liable to Campbell for breach of contract and related claims because WeCare failed to pay several invoices for hauling services provided by Campbell. The complaint further alleged that, under a theory of successor liability, Denali was also liable for the debt WeCare allegedly owed. On August 25, 2020, the trial court granted Campbell's motion for partial judgment on the pleadings and entered judgment in Campbell's favor and against WeCare in the amount of $120,472.00, with pre-judgment interest. Thereafter, on February 16, 2024, the trial court granted summary judgment in favor of Campbell and against Denali in the amount of $120,472.00, together with pre-judgment and post-judgment interest. Campbell reduced this order to judgment on March 13, 2024. Denali subsequently entered a default judgment on April 22, 2024, against WeCare after its cross-claims against WeCare asserting, *inter alia*, that WeCare was solely liable for any damages incurred by Campbell, went unanswered. This produced a final order from which Denali now appeals.

---

Denali in its praecipe to enter default judgment against WeCare Organics, LLC d/b/a WeCare Organics, LLC (collectively, "WeCare").

The trial court summarized the factual and procedural history as follows:

[Campbell] is in the hauling business with a [principal] place of business in Elizabethville, [Pennsylvania.] Both [WeCare] and Denali, are limited liability companies organized under the laws of New York State. The principal place of business for both [WeCare and Denali is] Jordan, New York[. WeCare and Denali are in the business of collecting, hauling, treatment, and composting yard and wood waste, biosolids, and other waste products.]

[Campbell] initiated [a] commercial collection action by filing a *writ* of summons on January 31, 2019. [Campbell] later filed a complaint on April 26, 2019, asserting claims against both [WeCare and Denali], jointly and severally, for breach of contract (Count I), quantum meruit/unjust enrichment (Count II), and account stated (Count III).

[Campbell] alleged that in March 2014, he entered into a contractual relationship with WeCare to haul and apply the WeCare product, picking it up at WeCare's Blackwood location in Tremont[, Pennsylvania,] in exchange for WeCare's payment. Between June 5, 2014[, and] December 1, 2015, [Campbell] made numerous hauling trips under the agreement, as evidenced by a payment schedule attached to the complaint. [Campbell] alleged that WeCare defaulted under the agreement by failing to timely and fully pay for services rendered, totaling $120,472[.00]. [Campbell] asserted that WeCare never once protested any invoice. [Campbell] further alleged that as a result of Denali having "merged" with WeCare [on] June 1, 2017, Denali became jointly and severally liable with WeCare for all liabilities alleged.

WeCare filed an answer with new matter admitting [to having a] contractual relationship with [Campbell], receiving regular invoicing, and failing to protest the invoicing. WeCare further failed to deny that [Campbell] rendered the services invoiced. WeCare did deny that it had "merged" with Denali, however, asserting only that Denali had purchased certain assets of WeCare.

On July 2, 2020, [Campbell] filed a motion for partial judgment on the pleadings against WeCare[. The trial court granted the] motion [] on August 25, 2020. [The trial] court entered judgment against WeCare in the principal amount of $120,472.00, with

pre[-]judgment interest at the rate of 6% commencing December 1, 2015.

On February 2, 2022, after a period of docket inactivity, Denali filed an answer with new matter to [Campbell's] complaint, as well as a cross-claim against WeCare. In the cross-claim, Denali asserted that WeCare was solely liable to [Campbell].

On December 1, 2023, after the pleadings against Denali were closed and following another period of docket inactivity, [Campbell] filed a summary judgment motion against Denali. [Campbell] argued that Denali was liable for the judgment entered against WeCare under one or both of two exceptions to the general rule against successor liability: *de facto* merger and mere continuation. After Denali answered the summary judgment motion, briefs were submitted and[,] following oral argument, [the trial] court issued an order on February 16, 2024, granting [Campbell's] summary judgment motion, stating as follows:

> The [trial] court finds that there are no genuine issues of material fact and that [Denali] is subject to successor liability for [WeCare] pursuant to the *de facto* merger doctrine.

> Summary judgment is GRANTED in [Campbell's] favor against [Denali] in the amount of $120,472.00 in addition to both pre[-]judgment interest since December 1, 2015, and post[-]judgment interest since August 25, 2020, at the applicable legal rates and costs of suit.

On March 13, 2024, [the trial] court entered judgment in favor of [Campbell] and against Denali for $180,647[.00], which included applicable interest and costs to date.

On April 22, 2024, [Denali] obtained default judgment against [WeCare] for its failure to plead to Denali's cross-claim asserting that WeCare was solely liable for any damages incurred by [Campbell]. Judgment was entered that day in Denali's favor and against WeCare for $120,427.00 plus interest and costs. At this juncture, all claims [were resolved] in this action. On May 17, 2024, [ ] Denali filed an appeal from the [judgment entered on April 22, 2024], in order to challenge [the trial] court's order of February 16, 2024, granting [Campbell's] summary judgment motion and finding that Denali was liable to [Campbell] on successor liability grounds under a *de facto* merger theory, which order was reduced to judgment on March 13, 2024.

Trial Court Opinion, 8/5/24, at 1-3 (citations and extraneous capitalization omitted).

On appeal, Denali raises the following issue for our review:[2]

[1.]   Whether the trial court erred in granting summary judgment in favor of Campbell and against Denali on the theory of *de facto* merger.

Denali's Brief at 5 (extraneous capitalization omitted).

Our standard and scope of review of an order granting summary judgment is well-settled.

A reviewing court may disturb the order of the trial court only where it is established that the [trial] court committed an error of law or abused its discretion.  As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule.  [*See*] Pa.R.C[iv].P. 1035.2.  [Rule 1035.2] states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered.  Where the non-moving party bears the burden of proof on an issue, he[, or she,] may not merely rely on his[, or her,] pleadings or answers in order to survive summary judgment.  Failure of a non-moving party to adduce sufficient evidence on an issue essential to his[, or her,] case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.  Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

_____

[2] The trial court did not order Denali to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  The trial court filed its Rule 1925(a) opinion on August 5, 2024.

*Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (case citations, ellipses, and quotation marks omitted); *see also Smith v. A.O. Smith Corp.*, 270 A.3d 1185, 1191-1192 (Pa. Super. 2022), *appeal denied*, 283 A.3d 1247 (Pa. 2022).

As a general principle of corporation law, "a purchaser of a corporation's assets does not, for such reason alone, assume the debts of the selling corporation, unlike a purchaser of the corporation's stock." *Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc.*, 42 A.3d 951, 954 (Pa. 2012). In *Fizzano*, our Supreme Court explained that an exception to this general principle exists when

> (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or a *de facto* merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation.

*Id.* at 954 n.2 (brackets omitted), *quoting* *Continental Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005). Of concern in the case *sub judice* is the *de facto* merger exception to the general principle of law regarding successor liability.

> For a *de facto* merger to occur, there must be continuity of the successor and predecessor corporation as evidenced by (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor, and (4) a continuity of management,

personnel, physical location, aspects, and general business operation. Not all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto* merger.

**Fizzano**, 42 A.3d at 962 (citation omitted). As the **Fizzano** Court explained,

the elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure.[3]

*Id.* at 969. In addressing whether the *de facto* merger exception requires proof of continuity of ownership, our Supreme Court stated that, in cases rooted in, *inter alia*, breach of contract (as is the situation, in the case *sub judice*), "the *de facto* merger exception requires 'some sort of' proof of continuity of ownership or stockholder interest." **Id.** "[S]uch proof is not restricted[, however,] to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice[.]" **Id.** For example, as the **Fizzano** Court explained, a shareholder may receive obligations, *i.e.*, promissory notes, in lieu of shares of stock in the successor corporation. **Id.** Finally, the **Fizzano** Court stated that the *de facto* merger exception "including its continuity of ownership prong, will always be subject to the fact-specific nature of the particular underlying corporate realities and

---

[3] The statutory requirements to effectuate a merger of, *inter alia*, two domestic entities, are set forth at 15 Pa.C.S.A. §§ 331-336.

will not always be evident from the formalities of the proximal corporate transaction. These realities may include an issue concerning which entity is actually the true predecessor corporation." **Fizzano**, 42 A.3d at 969.

Here, Denali does not contest that Campbell established the third and fourth prongs of the *de facto* merger exception, as discussed *supra*. **See** Denali's Brief at 15 (stating, Denali does not contest "that it assumed a significant portion of the liabilities necessary for the continuation of the enterprise" or that "there was a significant continuation of management, operations, and facilities"); **see also Fizzano**, 42 A.3d at 962. Rather, Denali contends that "Campbell failed to adduce sufficient evidence of continuity of ownership or dissolution of WeCare to be entitled to summary judgment." Denali's Brief at 15.

#### Continuity of Ownership

Regarding the continuity of ownership prong, Denali contests the trial court's determination that no genuine issue of material fact exists as to whether continuity of ownership exists between WeCare and Denali. **Id.** at 15-22. In support of its position, Denali argues that Campbell failed to demonstrate "symmetry of ownership" between WeCare and Denali because the record established that Charles Wesley Gregory, III ("Gregory"), who was WeCare's chief executive officer and had "indirect equity interests in WeCare,"

did not receive an ownership interest in Denali, as the purchaser corporation.[4]

*Id.* at 16.  Denali further argues that Jeffrey J. LeBlanc ("LeBlanc"), who also had "indirect equity interests in WeCare," did not receive an equity interest in Denali.[5]  *Id.* at 17.  Instead, LeBlanc received an employment agreement and served initially as the president of Denali but was "demoted" to the position of chief growth officer.  *Id.* at 18.  Denali maintains that, pursuant to the asset purchase agreement, a new limited liability company, WeCare Denali, LLC, was formed with Denali as the sole member of the newly-formed limited liability company.  *Id.* at 18-19.  Denali asserts that neither Gregory nor LeBlanc, both of whom had "indirect equity interests" in WeCare, were members of, or held an equity interest in, Denali.  *Id.* at 19, 21.

In finding that continuity of ownership existed between the two companies, the trial court adopted the argument set forth by Campbell in his summary judgment submissions as its findings of fact and conclusions of law.  We summarize those findings of fact and conclusions of law as follows:

> The undisputed facts show that [LeBlanc] was the founder and an indirect equitable owner of WeCare prior to execution of the [asset purchase agreement.  The asset purchase agreement required that] LeBlanc [] be provided with a certain employment

---

[4] In its answers to Campbell's first set of interrogatories, WeCare identified Gregory as having a 10% ownership interest in WeCare.  Campbell's Motion for Summary Judgment, 12/1/23, at Exhibit I (Campbell's First Set of Interrogatories, Question #1).

[5] WeCare identified LeBlanc as having a 30% ownership interest in WeCare. Campbell's Motion for Summary Judgment, 12/1/23, at Exhibit I (Campbell's First Set of Interrogatories, Question #1).

agreement establishing [him] as a senior executive of [Denali]. Indeed, LeBlanc joined Denali as its president and continues to be employed by Denali as a senior executive, recently or presently holding the position of chief growth officer.

. . .

Section 5.15 of the [asset purchase agreement] obligated Denali to enter into an employment agreement with LeBlanc at the time of closing. Accordingly, not only did LeBlanc receive a cash payment in return for his ownership interest in WeCare, he received compensation and employment rights in Denali's executive management team pursuant to an employment contract for no less than three years following closing which could only be terminated for cause. To date, he remains employed by Denali. This is precisely the type of alternative interest which could be received in a plan of merger by a selling shareholder as contemplated by Pennsylvania's legislature. *See* 15 Pa.C.S.[A.] § 3[3]2(a)(3)(i) ("converting some or all of the of the interests in a merging association into interests, securities, obligations, money, or other property, rights to acquire interests or securities, or any combination of the foregoing["]). Denali does not dispute that LeBlanc received rights under an employment agreement and cash in exchange for his interests in WeCare. Continuity of ownership is clearly established[. T]he law does not require continuity of all ownership nor does it require the receipt of shares in the new entity for the continuity of ownership prong of the *de facto* [merger exception] to be established. [Denali] pointed to nothing contradictory in the record, admitting to LeBlanc's continued employment as part of Denali's executive team, arguing only that such is insufficient to establish continuity of ownership. These facts are not in dispute and this factor counsels in favor of finding a *de facto* merger occurred[.]

Trial Court Opinion, 8/5/24, at 8, 10-11 (extraneous capitalization and some citations omitted).

The issue of whether LeBlanc's receipt of an executive management agreement, coupled with the payment of cash, as part of the asset purchase agreement establishes continuity of ownership for purpose of the *de facto*

merger exception appears to be an issue of first impression. In ***Fizzano***, ***supra***, our Supreme Court agreed with the United States Eleventh Circuit Court of Appeals in ***Bud Antle, Inc. v. Eastern Foods, Inc.***, 758 F.2d 1451 (11th Cir. 1985) and held that the continuity of ownership prong of a *de facto* merger analysis required a showing of "some sort of continuation of the stockholder's ownership," meaning that the stockholders of the predecessor company must have an ownership interest in the successor company after the completion of the transaction. ***Fizzano***, 42 A.3d at 968, *citing* ***Bud Antle***, 758 F.2d at 1458. The ***Fizzano*** Court explained that a continuation of stockholder ownership is required "because corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself. The corporate entity and its shareholders ultimately are responsible for the disposition of the corporation's assets and the payment of its debt." ***Fizzano***, 42 A.3d at 968 (original quotation marks and citation omitted).

In defining the circumstances that establish continuity of ownership, we are persuaded by the explanation set forth by the United States Third Circuit Court of Appeals in ***U.S. v. General Battery Corp., Inc.***, 423 F.3d 294, 306 (3rd Cir. 2005), *cert. denied*, 549 U.S. 941 (2006) that continuity of ownership exists "where the shareholders of the seller corporation become a constituent part of the purchasing corporation." ***General Battery***, 423 F.3d at 306 (applying Pennsylvania law). As the Third Circuit Court of Appeals explained, "[t]he overriding goal of successor liability, and of the *de facto* merger inquiry, is to balance the interest in preventing tortfeasors [(or in the case of contracts,

- 11 -

a company that is in breach of an underlying contract)] from externalizing the costs of their misconduct [(or acts in breaching the underlying contract)] with the interest in a fluid market in corporate assets." *Id.* (citation and original quotation marks omitted). In other words, "[t]he continuity of shareholders element is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability." *Id.* (citations omitted).

In short, we find that the continuity of ownership prong requires a trial court to scrutinize the transaction to determine if the shareholders of, or those having an equity interest in, the seller company retained the benefits of their ownership in the assets transferred to the purchaser company by obtaining an ownership interest in the purchaser company while the creditors of the seller company are left without any remedies to collect their debt. This type of analysis is in keeping with the equitable principles which form the basis of the *de facto* merger exception. *See Fizzano*, 42 A.3d at 968 (stating, "[t]he *de facto* merger exception is not strictly contractual because it is an equitable principle, ultimately designed to look beyond the contract" (emphasis omitted), *citing Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465 (3rd Cir. 2006)).

With this analytical approach in mind, we turn to the case *sub judice*. Here, the asset purchase agreement entered into between Denali and WeCare identified LeBlanc as a guarantor of WeCare and owning "indirectly, equity

interests" in WeCare. Asset Purchase Agreement, 10/7/16, at 1.[6] Pursuant to the asset purchase agreement, Denali agreed to purchase certain assets of WeCare in exchange for, *inter alia*, cash, assumption of certain notes payable to third parties, and assumption of certain other liabilities, all of which were identified in the asset purchase agreement. ***Id.*** at § 2.02. As a condition of closing, Denali was also required to enter into a mutually acceptable executive management agreement with LeBlanc. ***Id.*** at § 2.06. Under the terms of the executive management agreement, LeBlanc became a senior executive of Denali because LeBlanc possessed "certain experience and expertise" that Denali wished to retain. Executive Management Agreement, 10/7/16, at 1.[7] Under the executive management agreement, LeBlanc was to receive, *inter alia*, a base rate of pay, bonus compensation, and other benefits for which he was eligible. ***Id.*** at ¶5. If LeBlanc were "fully and properly performing [his] duties for [Denali] and meeting his obligations [] to the satisfaction of [Denali's chief executive officer,] LeBlanc was not restricted from, *inter alia*, purchasing up to 1% of any class of outstanding stock in Denali that is traded on a national securities exchange market and from continuing to serve as WeCare's president. ***Id.*** at ¶9(d)(iv). Importantly, the executive management agreement did not provide LeBlanc with any equity ownership in

___

[6] The asset purchase agreement was attached to Campbell's motion for summary judgment and identified as Exhibit A.

[7] The executive management agreement was attached to Denali's answer to Campbell's motion for summary judgment and identified as Exhibit 1.

Denali, other than the conditional right permitting LeBlanc to purchase up to 1% of Denali stock in an open market transaction. Moreover, Leblanc did not receive, as part of the asset purchase agreement, an ownership interest in Denali in exchange for his indirect equity interest in WeCare. Therefore, in viewing the evidence in the light most favorable to Denali, as the non-moving party, we find that the trial court erred as a matter of law and abused its discretion in concluding that no genuine issue of material fact existed as to the continuity of ownership between WeCare and Denali because LeBlanc received cash and subsequent employment as part of Denali's senior management team. Instead, the record establishes that, while LeBlanc subsequently become a senior executive for Denali, LeBlanc did not receive an ownership interest in Denali in exchange for his equity interest in WeCare as part of the asset purchase agreement. Therefore, based upon the record currently before us, Campbell is not entitled to summary judgment because he failed to establish the continuity of ownership prong of the *de facto* merger exception to successor liability. **Fizzano**, 42 A.3d at 969.

### **Cessation of Ordinary Business and Dissolution**

Denali also challenges the trial court's determination that no genuine issue of material fact existed as to whether WeCare ceased its ordinary business operations and dissolved after the transaction was completed. Denali's Brief at 22-23.

As discussed *supra*, an analysis of the second prong of the *de facto* merger exception requires a trial court to consider whether there was a

cessation of the seller company's ordinary business and its dissolution as soon as practically and legally possible after the completion of the transaction. *Fizzano*, 42 A.3d at 962. The essence of this prong of the *de facto* merger exception is that one business entity survives while the other business entity ceases to exist. *See General Battery*, 423 F.3d at 308 (stating, "an essential characteristic of a merger is that one corporation survives while another ceases to exist"), *citing* *Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 367 (3rd Cir. 1974) (applying Pennsylvania law), *cert. denied*, 421 U.S. 965 (1975).

In *Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc.*, 973 A.2d 1016 (Pa. Super. 2009), *vacated on other grounds by*, *Fizzano*, *supra*, this Court upheld the trial court's determination that there was no cessation of ordinary business and dissolution by the seller corporation. *Fizzano*, 973 A.2d at 1022. As this Court noted, the evidence did not reveal an intent by the two business entities that the seller corporation would cease operations and dissolve as soon as legally and practically possible after the completion of the transaction. *Id.* In fact, this Court found that the record revealed that the seller corporation remained in business after the transaction, changed its corporate name, retained two of its customers, and retained physical and intellectual property assets that allowed the seller corporation to service its two remaining customers. *Id.* Finally, the asset purchase agreement included a covenant not to compete between the seller corporation and the buyer corporation. Under these circumstances, the panel in *Fizzano* agreed that

the absence of a cessation of ordinary business followed by a dissolution weighed against application of the *de facto* merger exception. ***Id.***; ***see also A.O. Smith***, 270 A.3d at 1190, 1198 (agreeing that, the seller corporation did not cease its ordinary business and dissolve as evidenced by, *inter alia*, a Pennsylvania Department of State business document search report).[8]

Express terms of an asset purchase agreement that require cessation and dissolution may, however, compel a different result. In **General Battery**, **supra**, the Third Circuit Court of Appeals, applying Pennsylvania law, agreed with the federal district court that there was a cessation of ordinary business and dissolution where the asset purchase agreement required the seller corporation to, *inter alia*, discontinue its business operations immediately, change its legal entity name and remain solvent through the end-of-year for, *inter alia*, audit purposes, and complete dissolution by a set time. **General Battery**, 423 F.3d at 307-308 (stating, "[t]he contractual requirement that [the seller corporation] immediately change its name, cease operations, and subsequently liquidate and dissolve, is more characteristic of a merger than an asset purchase"). The Third Circuit Court of Appeals further explained that, although the seller corporation remained "operational" for over a year after the transaction, this was insufficient to negate application of the cessation of

_____

[8] The Pennsylvania Department of State maintains a website, www.https://file.dos.pa.gov/search/business, where an individual may search for a particular business entity registered with the Commonwealth and learn the status of that business entity, *i.e.*, active, inactive-terminated, inactive-dissolved, or inactive-expired.

ordinary business and dissolution prong of the *de facto* merger exception. *Id.* at 308. The "salient fact," as the Third Circuit Court of Appeals explained, was that the seller corporation ceased ordinary business operations, changed its legal entity name within one week of the transaction, and became a "corporate shell" with only cash reserves pending the year-end audit. *Id.*; *see also Knapp*, 506 F.2d at 369 (finding that the cessation of ordinary business and dissolution prong was satisfied when the seller corporation "technically" continued to exist for 18 months after the transaction but was a "barren corporation" with no substance and no ability to undertake business operations).

The cessation of ordinary business and dissolution prong was similarly applied by this Court in *Commonwealth v. Lavelle*, 555 A.2d 218 (Pa. Super. 1989) (*en banc*), *appeal denied*, 555 A.2d 218 (Pa. 1989).[9] In *Lavelle*, this Court agreed that the evidence established the cessation of ordinary business and dissolution prong where the seller corporation ceased its ordinary business shortly after the transaction and, although it did not

---

[9] Our Supreme Court in *Fizzano*, *supra* , distinguished, in part, this Court's *en banc* decision in *Lavelle*, *supra*, on the grounds that the *Lavelle* Court found that "the absence of common legal ownership is not an impediment to finding the asset-purchasing corporation as the *de facto* successor corporation to the asset-selling corporation" was not necessary for imposing criminal and civil liability for racketeering acts. *Fizzano*, 42 A.3d at 963; *see also Lavelle*, 555 A.2d at 228. Rather, as discussed *supra*, our Supreme Court in *Fizzano* held that, "**in cases rooted in breach of contract and express warranty**, the *de facto* merger exception **requires** 'some sort of' proof of continuity of ownership or stockholder interest." *Fizzano*, 42 A.3d at 969 (emphasis added).

dissolve, "was reduced to an assetless shell." **Lavelle**, 555 A.2d at 228. To support a finding that the seller corporation was reduced to an assetless shell, the **Lavelle** Court explained that the buyer corporation assumed all of the liabilities of the seller corporation that were necessary for the seller corporation to continue its ordinary business, the buyer corporation was granted an extension of the seller corporation's health insurance policy on the basis that a mere "name change" had occurred, the buyer corporation assumed seller corporation's accounts payable and other contractual obligations, and the buyer corporation identified itself to the Department of Labor and Industry as the "successor corporation." **Id.**

In the case *sub judice*, Denali asserts that Campbell failed to establish that there was no genuine issue of material fact as to the cessation of ordinary business and dissolution prong of the *de facto* merger exception. Denali's Brief at 22-23. In particular, Denali argues that the asset purchase agreement required WeCare to change its legal entity name, adhere to a non-compete covenant, and remain solvent based upon its retained business. **Id.** at 22. Denali contends that "it is apparent that the [asset purchase agreement] contemplated that WeCare would, under certain conditions, continue its operations. This interpretation is buttressed by WeCare's March 16, 2017 letter to its vendors indicating that WeCare hopes to ramp up operations and pay unsecured creditors." **Id.** at 23. Finally, Denali asserts that the asset purchase agreement does not require WeCare, as part of the transaction, to cease ordinary business operations and dissolve as soon as possible. **Id.**

Instead, while WeCare maintained that it was "defunct," it did not, according to Denali, formally dissolve but, rather, remained an active business entity in New York State and Pennsylvania. *Id.*

In response, Campbell acknowledges that WeCare did not formally dissolve and remains an active corporate entity but argues that WeCare "was reduced to an assetless shell, unable to continue operating following the transaction[.]" Campbell's Brief at 27. Campbell contends that the uncontroverted evidence in the record established that (1) WeCare was required to change its legal entity name under the terms of the asset purchase agreement, but failed to do so, (2) WeCare was prevented, under the terms of the asset purchase agreement, from engaging in certain business activities in competition with Denali, (3) the transaction was "held out to be a 'merger' by both [parties,]" (4) WeCare no longer conducted business and described itself as "defunct," and (5) WeCare was unable to meet its unsecured creditor obligations following the transaction and became "defunct." *Id.* at 30-31. Campbell asserts that, after the transaction, WeCare "ceased its business and [Denali] picked up WeCare's business [] where WeCare left off." *Id.* at 31. Campbell contends that Denali failed to establish that WeCare continued its ordinary business operations and that the trial court correctly determined that no genuine material fact remained as to the cessation of ordinary business and dissolution prong of the *de facto* merger exception. *Id.*

In explaining why no genuine issue of material fact remained as to the cessation of ordinary business and dissolution prong of the *de facto* merger

exception entitling Campbell to summary judgment, the trial court again adopted the argument set forth by Campbell in his summary judgment submissions as its findings of fact and conclusions of law. We summarize the trial court's finding of fact and conclusions of law as follows:

> WeCare became a "defunct" entity no longer conducting any business. A screenshot of WeCare Denali[ LLC]'s website detailing its history [] shows that WeCare and Denali "merged . . . to successfully form [WeCare] Denali[,] LLC, one of the largest organics and residuals management companies in the [United States]." WeCare itself informed unsecured creditors, such as [Campbell] that it "stopped all non-essential [WeCare] activity" following execution of the asset purchase agreement. Likewise, WeCare apparently [] described the transactions as one which effected a merger, changed the ownership of WeCare and stated that WeCare had been purchased by Denali.
>
> Taken together, the record reveals that the transaction between WeCare and Denali was not simply an asset purchase, but the veiled purchase of the business itself. The purchase of assets from a company does not require that the selling business change its name to continue conducting business, does not require that the selling entity refrain from competing with the purchasing company in the marketplace, and generally allows the selling entity to continue its business. The net result of these actions was WeCare's business ceasing to continue, not just a mere transfer of some business assets to a wholly separate entity. Although not formally dissolved, WeCare was reduced to an "assetless shell." The transaction between WeCare and Denali resulted in the WeCare biosolids business and brand being assumed by Denali and [Gregory] going his separate way to continue operating his various hauling and construction businesses.
>
> . . .
>
> While [Denali] argues that the [asset purchase agreement] required WeCare to do a variety of items to remain in operation, Denali cites nowhere in the record which shows that such requirements were satisfied by WeCare or that such requirements were carried out. Rather, Denali points to mere aspirations and hopes in support of its contention that WeCare continued its

- 20 -

operations, ignoring the practical realities which resulted from the transaction between Denali and WeCare. In short, [Denali] fails to point to any factual dispute over whether WeCare continued its ordinary business operations - it did not.

[The trial] court [is required to] look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences. Examining what actually occurred in this transaction reveals that WeCare was left unable to continue its operation and that Denali picked up the business where WeCare had left off. Denali points to what WeCare hoped would occur (a ramp up in business) in an attempt to show that WeCare continued its business. But, as evidenced by the record, no such ramp up ever came to fruition as WeCare remained unable to pay its unsecured creditors - such as [Campbell.] Likewise, [Denali] points to the supposed continuation of WeCare, but produces no factual evidence to contradict WeCare's statement that it was and remains a "defunct" entity. More so, Denali produce[d] no evidence of distributions, profits, or contracts post-dating the closing date under the [asset purchase agreement] to support its argument that WeCare's business continued. While [Denali] points to a contract which was not included in the [asset purchase agreement] as evidence that WeCare continued its business, it fails to produce any evidence detailing what that contract was or whether it related to WeCare's business pertaining to biosolids which was sold under the [asset purchase agreement] despite having the opportunity to do so. To the contrary, the [asset purchase agreement] clearly provides that Denali purchased WeCare's business, defined by the [asset purchase agreement] as "the business and operations of [WeCare] as of the closing which includes the collection, hauling, treatment[,] and composting of yard and wood waste, biosolids, and other waste products collected pursuant to contracts with municipalities and state governments relating to the acquired contracts and the other acquired assets." The whole of WeCare's business was purchased by Denali under the guise of an asset purchase arrangement while entirely separate entities and their assets - owned also by Gregory - were excluded from the transaction. [Denali's] attempt to point to provisions in the [asset purchase agreement to] suggest that WeCare's business continued is futile and does not create a disputed material fact absent the submission of evidence showing that WeCare's business actually continued and[,] thus[,] must be rejected.

. . .

> [Denali] argues that because WeCare is still technically "active" on state entity registration databases it cannot be deemed to have ceased to exist. Such argument would require [the trial] court to ignore WeCare's existence as continuing in name only. In reality, it is an inactive, defunct entity which no longer conducts its previous business involving the [] collecting, hauling, treating, and composting of yard and biosolid waste. In its place, Denali has picked up where WeCare left off to continue such business.

Trial Court Opinion, 8/5/24, at 8-9, 11-12 (citations, some quotation marks, and extraneous capitalization omitted).

It is undisputed that "WeCare's business included 'the collection, hauling, treatment[,] and composting of yard and wood waste, biosolids, and other waste products collected pursuant to contracts with municipalities and state governments[.]'" Campbell's Motion for Summary Judgment, 12/1/23, at ¶19; *see also* Denali's Answer to the Motion for Summary Judgment, 1/2/24, at ¶19. The parties further agree that the asset purchase agreement required, *inter alia*, that (1) LeBlanc receive an executive position within Denali's executive management team, (2) WeCare change its legal entity name within 24 months of the transaction, (3) WeCare agree to a non-compete provision that precluded it from engaging in restricted business (meaning the portion of the business acquired by Denali) in a restricted territory (Pennsylvania, New York, Vermont, Connecticut, Massachusetts, Rhode Island, New Hampshire, and Maine) for a period of five years, and (4) Denali and WeCare would cooperate in all public announcements regarding the transaction. Campbell's Motion for Summary Judgment, 12/1/23, at ¶20(a - c and e); *see also* Denali's Answer to the Motion for Summary

Judgment, 1/2/24, at ¶19 (a - c and e). Under the asset purchase agreement, the parties agree that Denali assumed certain assets and contracts, as well as certain liabilities, belonging to WeCare as part of the transaction. Campbell's Motion for Summary Judgment, 12/1/23, at ¶21; **see also** Denali's Answer to the Motion for Summary Judgment, 1/2/24, at ¶21.

While Denali acquired certain contracts held by WeCare with third parties (**see** Campbell's Motion for Summary Judgment, 12/1/23, at ¶21; **see also** Denali's Answer to the Motion for Summary Judgment, 1/2/24, at ¶21), Denali did not purchase, and WeCare retained, other existing contractual relationships with customers. **See** Asset Purchase Agreement, 10/7/16, at Article I (Definition of "Acquired Contracts") and §§ 2.07 and 3.08). For example, Section 5.14 of the asset purchase agreement permitted WeCare to retain use of a certain piece of equipment that was part of the "acquired assets" under the terms of the asset purchase agreement in order that WeCare could continue to provide service to its customer located in Bethlehem, Pennsylvania." **Id.** at § 5.14. WeCare was also permitted to retain rental payments it received from this customer for use of the equipment. **Id.** Moreover, Section 3.23 of the asset purchase agreement set forth that, as of the closing of the transaction, WeCare was a solvent "ongoing business" that owned "assets which are sufficient for it to continue in operation[.]" **Id.** at § 3.23. Finally, the executive management agreement that LeBlanc obtained as a condition of the asset purchase agreement permitted LeBlanc to continue

to act as president of WeCare while still serving as an executive at Denali. Executive Management Agreement, 10/7/16, at ¶9(d)(iv).

After the close of the transaction, WeCare, in a letter dated March 16, 2017, informed its vendors that "a portion of the business" was sold and that the funds obtained from the transaction were used to pay WeCare's secured vendors. Letter, 3/16/17. WeCare further explained that the funds were insufficient to continue business operations through "our low cash flow winter season" and as a result WeCare "stopped all non-essential [WeCare] activity." *Id.* WeCare expressed, however, that it was "gearing up for [its] heavy Spring/Summer season" and that, "with the remaining [WeCare] operations," it hoped to obtain sufficient funds to "resolve old open payable balances" with "unsecured vendors." *Id.* Thus, this letter suggests that, at least initially, WeCare intended, and represented to its vendors, that it planned to continue its business operations.

In response to Campell's first set of interrogatories directed to WeCare on July 8, 2022, WeCare stated that for the relevant time period, which was August 25, 2020, to the present, it was "defunct." Campbell's Motion for Summary Judgment, 12/1/23, at Exhibit I (Campbell's First Set of Interrogatories, Question #1). WeCare further answered that for the relevant time period it was "inactive" and that for the two years prior to answering the interrogatories, it did not have any income or revenue. *Id.* (Campbell's First Set of Interrogatories, Questions #2 and 4). Finally, the Pennsylvania Department of State showed that WeCare, at the time of Campbell's motion

for summary judgment, was an active business entity. Denali's Answer to Campbell's Motion for Summary Judgment, 1/2/24, at Exhibit 4.

We agree that no genuine issue of material fact exists as to whether WeCare was "defunct" and "inactive" as of August 25, 2020. A genuine issue of material fact remains, however, as to whether WeCare maintained its business operations after the close of the transaction (October 2016) until it became "defunct" some time prior to August 2020, sufficient enough to negate the cessation of ordinary business and dissolution prong of the *de facto* merger exception. The asset purchase agreement did not require WeCare to dissolve after the transaction but, rather, indicated an intent by the parties that WeCare would have sufficient business assets, including contracts and a revenue stream, to continuing operating. This intent is further evidenced by LeBlanc's executive management agreement that permitted LeBlanc to remain as president of WeCare after the transaction. ***Fizzano***, 973 A.2d at 1022. Hence, genuine issues of material fact exist as to the second prong of the *de facto* merger exception.

In sum, for the reasons set forth herein, we find that the trial court erred as a matter of law and abused its discretion in granting summary judgment in favor of Campbell and against Denali. In viewing the evidence in the light most favorable to Denali, as the non-moving party, factual disputes surrounding the continuity of ownership prong, as well as the cessation of ordinary business and dissolution prong, exist, as demonstrated by the record, that negate the trial court's application of the *de facto* merger exception to

successor liability and the granting of summary judgment. As such, we vacate the April 22, 2024 default judgment, together with the March 13, 2024 judgment entered against Denali and the trial court's February 16, 2024 order granting summary judgment in favor of Campbell and against Denali. We remand this case for further proceedings in accordance with this decision.

Judgment (April 22, 2024) vacated. Judgment (March 13, 2024) vacated. Trial Court Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/25/2025